UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED

OCT 1 9 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

CHRISTINE W. MCENTEE,
3606 Roberts Lane
Arlington, VA 22207

                   Plaintiff,

v.

AMERICAN COLLEGE OF CARDIOLOGY, INC.
2400 N Street, N.W.
Washington, D.C. 20037

        SERVE:
        CSC Lawyers Incorporating Service Co
        11 E. Chase Street
        Baltimore, MD 21202

and

AMERICAN COLLEGE OF CARDIOLOGY
FOUNDATION
2400 N Street, N.W.
Washington, D.C. 20037

        SERVE:
        Jack Lewin, M.D.
        ACCF
        2400 N Street, N.W.
        Washington, D.C. 20037

                Defendants.

CASE NUMBER   1:06CV01813

JUDGE: James Robertson

DECK TYPE: Employment Discrimination

DATE STAMP: 10/19/2006

JURY DEMAND

**COMPLAINT FOR DECLARATORY
AND MONETARY RELIEF AND JURY DEMAND**

**Preliminary Statement**

1.      This is a civil action against the American College of Cardiology, Inc., and the

American College of Cardiology Foundation under the common law of the State of Maryland, the

Maryland Wage Payment and Collection Act, and the Montgomery County Human Relations and

Civil Liberties Act for declaratory and monetary damages for injuries plaintiff Christine W.

McEntee has sustained as a result of defendants' breach of their employment contract with

plaintiff, their refusal to pay her wages owed under her Employment Agreement, their

discrimination against her on the basis of gender, and their retaliation against her for opposing

discriminatory conduct.

### Jurisdiction and Venue

2.      This court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332,

as the amount in dispute exceeds $75,000 and there is complete diversity of citizenship.

3.      Venue is proper in this district under 28 U.S.C. § 1391(a), as defendants ACC and

ACCF reside in this district.

### Parties

4.      Ms. McEntee is a citizen of the Commonwealth of Virginia who resides at 3606

Roberts Lane, Arlington, VA 22207.  From May 1998 to November 30, 2005, Ms. McEntee was

employed by either the American College of Cardiology or the American College of Cardiology

Foundation (or both), most recently as their Chief Executive Officer ("CEO").

5.      The American College of Cardiology Foundation ("ACCF" or "the Foundation")

is a non-profit corporation with its principal place of business at 2400 N Street, N.W.,

Washington, D.C. 20037.  Prior to moving its headquarters to Washington, D.C. in September

2006, ACCF had its principal place of business at 9111 Old Georgetown Road, Bethesda, MD

2

20814.  ACCF is a 501(c)(3) organization that, through research, education, and advocacy,

attempts to influence healthcare policy.  From May 1998 until approximately 2000, Ms. McEntee

was employed by ACCF as its Executive Vice President, and from 2000 until November 30,

2005, was employed by ACCF as its CEO.  Prior to changing its name in 2002, ACCF was

known as the American College of Cardiology.

6.      The American College of Cardiology ("ACC") is a non-profit corporation with its

principal place of business at 2400 N Street, N.W. 20037.  Prior to moving its headquarters to

Washington, D.C. in September 2006, ACC had its principal place of business at 9111 Old

Georgetown Road, Bethesda, MD 20814.  ACC is a 501(c)(6) organization that advocates for

cardiovascular care through education, research, promotion, development and the application of

standards and guidelines.  ACC was established in or around March 2002 to be the lobbying arm

of ACCF (which had previously been known as ACC).  Ms. McEntee served as the Executive

Vice President and CEO of ACC from its inception until November 30, 2005.

7.      In day to day practice, ACC and ACCF function seamlessly and share the same

members of the Board of Trustees.  The leadership and members typically refer to the

organization as ACC.  Hereinafter, unless specifically stated otherwise, the 501(c)(3)

organization (ACCF) and the 501(c)(6) organization (ACC) will be referred to, collectively, as

"ACC" or "the Organization."

**Factual Allegations**

8.      In May 1998, Ms. McEntee was hired by ACC to serve as its Executive Vice

President, and then as its CEO, at a salary of $250,000 per year, for a term of five years.  In

January 2003, ACC and Ms. McEntee entered into a second contract, in which Ms. McEntee

3

served as CEO at a salary of $350,000 per year, for a term of three years. ACC and Ms. McEntee

entered into a written contract ("Employment Agreement") in July 2003 memorializing their

agreement. A true and accurate copy of this Employment Agreement is attached and

incorporated herein as Exhibit 1.

9. Paragraph 1 of the Employment Agreement provides that "ACC agrees to retain

the services of Employee in the position of Chief Executive Officer for a term of three (3) years

with the effective commencement date of January 1, 2003, at a salary of $350,000, payable in

semimonthly installments."

10. Paragraph 3 of the Agreement provides that "Employee shall also be Chief

Executive Officer of the American College of Cardiology Foundation ("ACCF") and shall

provide competent executive management services for ACCF."

11. Paragraph 3(a) of the Employment Agreement provides, *inter alia*, that as CEO,

Ms. McEntee shall "[h]ave full, broad and exclusive authority to manage ACC and ACCF

operations, to hire, compensate and terminate ACC and ACCF staff and consultants within the

framework of the approved budget of ACC and ACCF, and to establish and modify the duties

and responsibilities of said staff and consultants . . . ." This same language also appeared in Ms.

McEntee's first written employment contract with ACC when she initially served as Executive

Vice President and then as CEO. Upon information and belief, this language also appeared in the

employment contracts of previous CEOs of ACC.

12. Paragraph 6 of the Employment Agreement provides that ACC may terminate its

obligations under the Agreement in the event of the death of Ms. McEntee; if due to physical or

mental illness or injury (defined as "disability"), Ms. McEntee is unable to perform the essential

4

functions of her position with or without reasonable accommodation for a continuous period of six months; or in the case of acts of fraud or gross negligence by Ms. McEntee (defined as "reasonable cause") that would prevent the effective performance of her duties. This paragraph 6 also provides that ACC may terminate the Agreement for any other reason (defined as "no cause"), but it must then provide Ms. McEntee with 4.5 months' prior notice of such termination or the equivalent pay in lieu of such notice.

13.    Paragraph 6 of the Employment Agreement also states that upon giving Ms. McEntee 4.5 months' notice for a "no cause" termination, ACC shall pay Ms. McEntee one year's salary, a good faith estimate of the bonus she would have received in the year of termination, unpaid bonuses attributable to prior years, and all benefits for a period of 12 months.

14.    Paragraph 6 of the Employment Agreement also provides that if Ms. McEntee wishes to terminate her obligations under the Agreement, she shall give ACC at least 4.5 months' advance written notice.

15.    Paragraph 11 of the Employment Agreement provides: "This instrument contains the entire agreement of the parties. It may not be changed orally, but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification, extension, or discharge is sought."

16.    Ms. McEntee signed the Employment Agreement on July 28, 2003. Carl J. Pepine, the then-President of ACC, signed the Employment Agreement for ACC on July 24, 2003. There has been no modification to the Employment Agreement since the time of its execution.

5

17. From May 1998 until November 30, 2005, when ACC terminated her employment, Ms. McEntee performed the duties of CEO for ACC in a diligent and conscientious manner. As provided for in the Employment Agreement, Ms. McEntee exercised "full, broad and exclusive authority to manage ACC and ACCF operations."

18. Ms. McEntee was the first and only female CEO of ACC.

19. After Ms. McEntee was hired as CEO, and there were several female employees on the executive management staff, a male Board member asked Ms. McEntee in a derisive manner: "Who are all these women running the place?" He also indicated that others on the Board had voiced the same concern. On several occasions, the male Executive Committee members asked Ms. McEntee whether ACC had enough men, and by implication too many women, in management positions. The Executive Committee and Board members, almost all of whom were men, were consistently more deferential and more attentive to the advice and counsel of male employees, such as the CFO, than they were to the women in executive management, such as Ms. McEntee.

20. From the beginning of her tenure with ACC, Ms. McEntee observed that the Organization tolerated an atmosphere in which male leadership sexually harassed and was verbally abusive towards women. Female Vice Presidents at ACC told Ms. McEntee about how they counseled new female employees on ways to cope with male leaders who make sexual advances towards them. It was also commonplace for male leaders at ACC to be verbally explosive and physically threatening to female employees. Ms. McEntee herself was subjected to verbal abuse by one of ACC's past male presidents. When she requested assistance from Board

6

members to try to address the situation, they told her to "hold her breath" and tolerate the behavior until his presidency ended.

21.    In early March 2005, Ms. McEntee made a decision to terminate the Organization's Chief Financial Officer ("CFO"), a personnel decision that was within her authority as CEO to make and was necessary to advance the best interests of the Organization.

22.    Ms. McEntee decided to terminate the CFO, who is male, based on issues surrounding his job performance, and in an effort to foster an environment within ACC in which sexist and otherwise unprofessional behavior would not be tolerated. Ms. McEntee had learned from various individuals at ACC that the CFO had, on numerous occasions, made openly sexist comments and was excessively brash and aggressive in his interactions with female employees and consultants. The CFO also frequently visited inappropriate websites on ACC computers. In deciding to terminate the CFO, Ms. McEntee was effectuating the Organization's sexual harassment policies.

23.    Ms. McEntee's decision to terminate the CFO was challenged by members of ACC's predominantly male Board of Trustees, many of whom were social friends with the CFO, and who themselves had been heard to question the authority of female executives at the Organization.

24.    When members of ACC's predominantly male Executive Committee learned of Ms. McEntee's decision to discharge the CFO, they immediately resisted and attempted to undermine her authority. ACC's Treasurer at the time, Jim Dove, stated that regardless of what the CEO's contract provided, he believed that ACC's Executive Committee should be consulted with and agree with the decisions before such personnel actions could be taken. This had never

7

before been the position of ACC with respect to management decisions by the Organization's
CEO. As stated clearly in Ms. McEntee's Employment Agreement, the CEO had "full, broad
and exclusive authority to manage ACC and ACCF operations [and] to hire, compensate and
terminate ACC and ACCF staff . . . ."

25.     In response to Ms. McEntee's stated decision in early March 2005 to terminate the
CFO, the ACC Executive Committee deviated from its normal policy with respect to CEO
decisions, as well as the Employment Agreement it had signed with Ms. McEntee, and requested
that the ACC President, Pamela Douglas, interview staff, review documents, and confirm Ms.
McEntee's facts regarding the CFO before his termination would be effectuated. The Executive
Committee ordered that Ms. McEntee's decision be reviewed even though Ms. McEntee
informed Executive Committee members about the CFO's sexually discriminatory behavior and
remarks towards an outside consultant during a meeting, and provided details regarding his
unacceptable performance and behavior over the past several years.

26.     In mid-March 2005, at the direction of the Executive Committee, Ms. Douglas
interviewed three ACC Vice Presidents regarding the CFO's performance. Soon thereafter, the
Executive Committee met in executive session via conference call and confirmed that Ms.
McEntee's decision to terminate the CFO had been warranted. In mid-March 2005, ACC
terminated the CFO's employment.

27.     Prior to March 2005, ACC had never required that the personnel decisions made
by its CEO be investigated or approved.

28.     On or about April 25, 2005, ACC's Executive Committee for the first time raised
concerns regarding Ms. McEntee's style of leadership and indicated that it preferred a more

8

"collaborative" style.   Members of the Executive Committee stated a desire to have the CEO's

decisions and leadership be more "collaborative" and to allow the Executive Committee to have

a larger role in management of the Organization.

29.    Around this time, Ms. Douglas made a comment to Ms. McEntee that the Board

would have trouble separating Ms. McEntee's decision to terminate the CFO from other

unrelated issues – a statement which Ms. McEntee understood to mean that members of the

Executive Committee would hold this decision regarding the CFO against her in the future.

30.    On May 11, 2005, Ms. McEntee sent a memorandum to the ACC Executive

Committee responding to the issues raised during the April 25 meeting.  Ms. McEntee stated that

the Board had never before raised issues about her leadership style, nor was there any suggestion

before, as there was now, that she cede the "full, broad and exclusive authority to manage ACC

and ACCF operations" accorded to her by her contract.  Ms. McEntee concluded her

memorandum by stating: "For as long as I remain CEO of the College, I plan to continue to

faithfully execute my job responsibilities in carrying out the policy set by the Board of Trustees

with energy, excellence, and effectiveness.  I remain willing to discuss any issues of concern and

work to find ways to address them."

31.    In late June 2005, the ACC Executive Committee decided to hold a mini-retreat

on governance at the Board Meeting scheduled for August 2005 and informed Ms. McEntee that

until then there would be no discussion regarding the issues raised in the April Executive

Committee meeting.

32.    In August 2005, a retreat focused on organizational governance was held during

the ACC Board Meeting.  Several Vice Presidents informed Ms. McEntee that the Executive

9

Committee members had told them that the governance issues were about Ms. McEntee specifically. After the governance session, the Executive Committee met separately with Ms. McEntee, who informed the Committee members that she did not believe ACC had a significant problem and pointed out that they themselves held differing views on governance and management issues. One female ACC Board member told Ms. McEntee during the August meeting that the Board disapproved of her authority as a female CEO, and that this was a male/female issue, with the male Board members wanting to be "in charge." At this same August Board Meeting, a male Board member asked an ACC employee whether the employee thought that ACC's governance "problems" were related to the fact that there were so many women in ACC management.

33.    On or about August 10, 2005, Ms. McEntee spoke by telephone with Tom Gilmore, a consultant hired by ACC to design and facilitate the retreat on governance. Mr. Gilmore told Ms. McEntee that he believed that the model desired by ACC  was workable but that he understood that it was not what she had "signed up for" as CEO. He also noted that what the ACC Board perceived as a matter of leadership style was really a different conceptual underpinning of the Organization.

34.    After the Board meeting in August 2005, Ms. Douglas appointed a working group on governance. Ms. Douglas rejected Ms. McEntee's suggestion that Ms. McEntee staff the working group. Instead, Ms. Douglas appointed Tom Arend, ACC General Counsel, to staff the working group. Ms. McEntee was not allowed to participate, despite her responsibility and contractual obligation as CEO to manage the affairs of ACC. Ms. Douglas also informed Ms. McEntee that all deliberations of the working group would be confidential to the group.

35.    The governance working group created a draft of a document regarding the roles and responsibilities of the ACC President, Executive Committee, Board of Trustees, and CEO. The document proposed a decrease in the responsibilities of the CEO, a corresponding increase in the responsibilities of the Executive Committee, and the status quo for the President and Board. The proposed changes greatly diminished the functions and management authority of the CEO, and dramatically altered Ms. McEntee's role within ACC.

36.    On September 13, 2005, Ms. McEntee sent a memorandum to the governance working group outlining her belief that strategic governance was the best model for ACC. Ms. McEntee noted the Board's desire to be more "member driven," but expressed her concern that ongoing oversight of management and operations by the Board of Trustees would move the Organization from strategic governance to member managed governance, which was inconsistent with her Employment Agreement, which assigned the CEO "full, broad and exclusive authority to manage ACC and ACCF operations."

37.    On October 4, 2005, Ms. McEntee sent her specific comments on the draft roles and responsibilities document to the governance working group and ACC's President, reiterating her concern that the proposed changes undermined her authority as CEO and violated her Employment Agreement.

38.    On or about October 31, 2005, Ms. McEntee met with the governance working group, which told her that ACC wanted a new governance model, with more management oversight by the Board. Ms. McEntee also reviewed the working group's report to the ACC Executive Committee regarding proposed governance changes which recommended that her duties and responsibilities as CEO be altered, and greatly diminished.

11

39.     In addition to governance changes, the working group also proposed making unilateral changes to Ms. McEntee's Employment Agreement to "better align" it with the newly-diminished roles and responsibilities of the CEO.  This was also inconsistent with Ms. McEntee's Employment Agreement, which required the written consent of the party against whom changes were sought – in this case Ms. McEntee.

40.     At the October 31, 2005 meeting referenced in paragraph 38 above, the Chair of the working group, Michael Wolk, stated that the Executive Committee should participate in all decisions, whether or not these decisions had previously been within the power of the CEO.  He stated that the Executive Committee must have a role in the hiring, firing, and ongoing evaluation of senior staff, including participation in quarterly evaluations of senior staff, thereby further diluting Ms. McEntee's duties and responsibilities.  Dr. Wolk indicated that changes would be necessary to the CEO employment contract in order to implement these changes.

41.     On November 10, 2005, Ms. McEntee sent a memorandum to the ACC Executive Committee and the working group on governance stating that "the proposed changes in roles and responsibilities, the implementation of new oversight mechanisms, and the proposed changes to the current CEO contract, will result in a fundamental and substantial change in the CEO's level of responsibility and authority that has applied over the past seven and a half years."  Ms. McEntee further stated that "the new role you seek for the CEO of ACC is inconsistent with the role set out in my contract with the ACC and the manner in which I have functioned during my tenure with the organization, and it is also a role I cannot accept for me personally and professionally. . . . I suggest we meet as soon as possible to find a mutually acceptable way to address this fundamental difference between us."

12

42.    On or about November 11, 1005, Ms. McEntee met with ACC's new CFO, Michael Votaw, and Mr. Arend to discuss the working group's recommendations and Ms. McEntee's objections to those recommendations. Mr. Arend acknowledged that Ms. McEntee and the Organization had different views regarding ACC's governance structure and the proposal to reduce her duties.

43.    On or about November 12, 2005, the ACC Executive Committee met to discuss the working group's report and proposed changes to Ms. McEntee's Employment Agreement "to ensure consistency between the College's governing documents and the CEO's contract." Ms. McEntee stated that she would not accept the proposed changes to her Employment Agreement. During the course of the meeting, former President Dr. Michael Wolk stated, in front of the entire Executive Committee and all of the Vice Presidents of the College, as well as Mr. Arend, that the Organization "would have to work out a transition to new staff leadership," implying that Ms. McEntee would have to step down as CEO. Ms. McEntee stated that she was not resigning her employment and continued to oppose changes to her employment contract and level of authority.

44.    Members of the ACC Executive Committee falsely told ACC employees and other member leaders that Ms. McEntee was planning to depart the Organization. Several members of the ACC Board of Trustees told Ms. McEntee that they would serve as a reference for her, even though she had never raised that issue with them or indicated an intention to leave the Organization.

45.    On several occasions between November 12 and 15, 2005, Mr. Arend confirmed to Ms. McEntee that the Executive Committee had determined it wanted a Chief Operating Officer ("COO"), rather than a CEO with broad management authority.

13

46.     On or about November 15, 2005, Ms. Douglas requested that ACC's Vice President for Human Resources, Nancy Rawles, establish a selection process for the CEO position in the event that the Board accepted the governance working group's recommendations and to draft a transition plan in the event one was needed. Ms. Douglas asked Mr. Arend to identify search firms to hire in the event that the ACC Board accepted the governance report recommendations and Ms. McEntee left the Organization.

47.     On or about November 15, 2005, Mr. Arendt asked Ms. McEntee what she viewed as a reasonable transition period in the event that she and the Executive Committee could not come to agreement on the management structure of ACC.   They agreed to consult with and seek the advice of an ACC consultant about the issue.

48.     Upon information and belief, on or about November 16, 2005, ACC Vice President Penny Mills asked the ACC President-elect, Steve Nissen, if the governance working group was a "cover" to get rid of Ms. McEntee. Mr. Nissen indicated that it was.

49.     On or about November 17, 2005, Ms. Douglas telephoned Ms. McEntee and asked her if she was planning a transition and whether she had informed her staff about her departure. Ms. McEntee made clear that she had not been planning a transition, that she had called together the Vice Presidents and Mr. Arend to discuss what was happening, and that they all agreed to continue to respond to questions raised in the November 12, 2005 Executive Committee meeting, and to do so in the manner agreed upon at that meeting.   At that same meeting, the Vice Presidents asked Ms. McEntee about a transition period and she responded that her Employment Agreement provided that both she and ACC had to provide the other with at least 4.5 months' notice (or pay in lieu of notice).

14

50.    On or about November 22, 2005, ACC formally approved the governance report, including changes that diminished Ms. McEntee's role and responsibilities as CEO. In so voting, ACC changed its form of governance, which reduced the breadth and level of Ms. McEntee's responsibility as CEO. These reductions were contrary to the material terms of her Employment Agreement.

51.    After the vote referenced in paragraph 50, above, Ms. McEntee informed the Board that these changes to her responsibilities and authority were unacceptable because they were contrary to the terms in her Employment Agreement, but once again made clear that she was not resigning her employment. In response, Ms. Douglas informed Ms. McEntee that she could accept the new arrangement, or she would be terminated. In response, Ms. McEntee repeated that she was not resigning but that she could not accept the new governance arrangement because it limited the authority guaranteed to her under her Employment Agreement. Ms. McEntee requested that ACC memorialize the options in writing. She further requested that she be given 24 hours to consider them. Ms. Douglas refused these requests. During the course of this meeting, Ms. McEntee made clear that she was willing to continue to work with ACC to achieve an effective transition of staff leadership.

52.    On or around November 27, 2005, Mr. Arend telephoned Ms. McEntee at her home to ask how she was doing. Ms. McEntee recounted her conversation with Ms. Douglas, and the threat Ms. Douglas had made to terminate Ms. McEntee's employment if she did not agree to either resign or accept the changes to her role and responsibilities. Mr. Arend told her that she was not being terminated, to which she responded that she would see him at work on Monday. Mr. Arend responded affirmatively.

53.     On or around November 28, 2005, Ms. McEntee reported to work, intent on assisting ACC to work out an effective leadership transition. Ms. Douglas sent an email to all ACC Vice Presidents asking them to meet. Ms. McEntee was not copied on this email, nor was she informed that ACC's officers were scheduled to come to ACC headquarters, known as Heart House, on December 1, 2005.

54.     Through the threats and the actions set out herein, ACC made clear that it no longer wished to retain Ms. McEntee as CEO, and was intent on marginalizing her and reducing her role in an effort to force her resignation. In fact, two members of the ACC staff told Ms. McEntee that they had received telephone calls from other organizations who had been advised that Ms. McEntee had been "let go" and that ACC was looking for a new CEO.

55.     By letter dated November 28, 2005, counsel for Ms. McEntee informed Mr. Arend that "the changes recently implemented by the Board of Trustees and the impact of those changes on the scope and level of responsibility of the CEO as outlined in [Ms. McEntee's] current employment agreement constitutes a material breach of that agreement." Ms. McEntee's counsel stated that "[u]nder the terms of her employment agreement, [Ms. McEntee] is entitled to 4.5 months of notice of a termination, one year's salary and benefits and a lump sum bonus."

56.     Instead of working with Ms. McEntee to implement an orderly leadership transition, on November 30, 2005, Ms. Douglas telephoned Ms. McEntee to inform her that ACC had terminated her employment. Ms. Douglas stated that given Ms. McEntee's resistance to the governance changes, ACC had no option but to terminate her for cause. In terminating Ms. McEntee's employment, Ms. Douglas never stated any reason that fit within the definition of "for reasonable cause," as spelled out in the Employment Agreement, which required an act of

16

fraud or gross negligence. That day, ACC turned off Ms. McEntee's computer and Blackberry and requested that she not return to ACC headquarters.

57.    By letter dated November 30, 2005, counsel for ACC informed counsel for Ms. McEntee that Ms. McEntee's stated philosophical differences with the governance policies and her alleged refusal to comply with ACC's work in implementing them, "is inconsistent with her contractual and employment obligations." The letter falsely accused Ms. McEntee of abandoning her professional duties and commitments, and stated that "[a]s a result of her conduct, as well [Ms. McEntee's counsel's] letter . . . she has left the College with no choice, but to request that she not return to Heart House after today."

58.    Until November 30, 2005, when Ms. Douglas informed Ms. McEntee that ACC had terminated her employment, Ms. McEntee continued to come to work and fulfill her duties and responsibilities as CEO as set forth in her Employment Agreement. At no time did Ms. McEntee refuse to perform her job, or take any action that, pursuant to the Employment Agreement, could be considered "reasonable cause" for her termination – i.e., an act of "fraud or gross negligence . . . as would prevent the effective performance of [her] duties." Based on the facts and the terms of the Employment Agreement, Ms. McEntee's termination by ACC was a "no cause" termination.

59.    ACC terminated Ms. McEntee's employment and refused, without a legal basis, to provide Ms. McEntee with any of the payments owed to her under the Employment Agreement. Its refusal to do so is without legal justification and constitutes bad faith.

60.    During November 2006, when it appeared as though ACC might choose to terminate her employment without cause, Ms. McEntee communicated with the American

17

Institute of Architects ("AIA") regarding a position as Executive Vice President and Chief

Executive Officer of AIA. Ms. McEntee expressed an interest in this position only after ACC

had made clear that it intended to change its direction and governance in a way that materially

diminished her position and was seeking to replace Ms. McEntee as part of that change. At all

times relevant during her negotiations with AIA, Ms. McEntee made it clear to AIA that she

would need to give ACC 4.5 months notice, as required under Paragraph 6 of the Employment

Agreement, if she intended to resign her employment at ACC. On or about December 6, 2005,

after ACC terminated her employment and insisted that she not return to ACC, Ms. McEntee

accepted employment with AIA as its Executive Vice President and Chief Executive Officer.

61.     On December 12, 2005, upon learning of her discussions with and subsequent

hiring by AIA, ACC refused to provide Ms. McEntee with the monies due her under the

Employment Agreement. ACC's refusal to pay Ms. McEntee the monies owed to her under the

Employment Agreement was without justification.

62.     Subsequent to terminating Ms. McEntee's employment, ACC hired Dr. Jack

Lewin, who is male, as its new CEO.

63.     On July 27, 2006, Ms. McEntee filed a charge of sex discrimination and

retaliation with the Baltimore Field Office of the U.S. Equal Employment Opportunity

Commission ("EEOC") and requested in writing that her charge be cross-filed with the

Montgomery County Office of Human Rights ("MCOHR"). The MCOHR has acknowledged in

writing its receipt of Ms. McEntee's charge from the EEOC. Because her charge has been

pending for more than 45 days, Ms. McEntee has fully exhausted her administrative remedies,

pursuant to Maryland Code, Article 49B, § 42(b)(1).

18

## COUNT I:
## BREACH OF CONTRACT

64.    Plaintiff hereby incorporates by reference as though restated each of the factual

allegations contained in paragraphs 1 through 63 above.

65.    Plaintiff and defendant entered into a valid, binding, and enforceable contract in

the form of the Employment Agreement.  Pursuant to paragraph 3 of the Employment

Agreement, plaintiff, as CEO, was to have "full, broad and exclusive authority to manage ACC

and ACCF operations, to hire, compensate and terminate ACC and ACCF staff and consultants

within the framework of the approved budget of ACC and ACCF, and to establish and modify

the duties and responsibilities of said staff and consultants . . . ."  Pursuant to paragraph 6 of the

Employment Agreement, upon termination without cause, defendant was required to give

plaintiff 4.5 months' notice, or pay plaintiff the equivalent of 4.5 months' salary in lieu of notice;

one year's salary and benefits; and a lump sum bonus.

66.    Defendant unilaterally approved and implemented changes that eliminated

plaintiff's ability to exercise "full, broad and exclusive authority to manage ACC and ACCF

operations" and in doing so breached the Employment Agreement.

67.    Defendant terminated plaintiff's employment with "no cause," as defined by the

Employment Agreement.  Defendant did not give plaintiff 4.5 months of notice or pay in lieu of

that notice, and has refused to pay plaintiff the compensation and benefits as required by

paragraph 6 of the Employment Agreement.

68.    Defendant's actions in failing to pay plaintiff compensation due under paragraph 6

of the Employment Agreement constitute a breach of the Employment Agreement.

19

69.     Defendant has repudiated its contractual obligations to plaintiff, and has not acted in good faith, and has not dealt fairly with plaintiff.

70.     Defendant's actions described above directly and proximately have caused, and continue to cause, plaintiff to suffer substantial economic damages.

71.     Defendant has committed this breach of the Employment Agreement in bad faith and with actual malice.

72.     Defendant ACC is liable to plaintiff for its breach of contract, the exact amount to be proven at trial, plus interest thereon.

**COUNT II:**
**VIOLATION OF THE MARYLAND WAGE PAYMENT**
**AND COLLECTION ACT, MD. CODE ANN. LAB. & EMPL. § 3-501 ET SEQ.**

73.     Plaintiff adopts and incorporates by reference as though restated each of the factual allegations contained in paragraphs 1 through 72 above.

74.     ACC, at all relevant times, was Ms. McEntee's employer for purposes of the Maryland Wage Payment and Collection Act., Md. Code Ann. Lab. & Empl. § 3-501, et seq.

75.     ACC willfully failed to pay Ms. McEntee the compensation due her under paragraph 6 of the Employment Agreement when it terminated her employment.

76.     All compensation to be paid to Ms. McEntee as detailed in paragraph 6 of the Employment Agreement was promised as part of compensation for her services and constitutes "wages" within the meaning of the Maryland Wage Payment and Collection Act, Md. Code Ann. Lab. & Empl. § 3-501, et seq.

77.     The aforesaid actions and/or omissions by ACC are in violation of the Maryland Wage Payment and Collection Act, Md. Code Ann. Lab. & Empl. § 3-501, et seq.

20

78.    ACC's withholding of Ms. McEntee's wages is not the result of a *bona fide* dispute.

79.    Pursuant to the Maryland Wage Payment and Collection Act, Md. Code Ann. Lab. & Empl. § 3-501, et seq., ACC is liable to Ms. McEntee in the amount of the compensation it has failed or refused to pay her, plus interest thereon, the exact amount to be proven at trial.

80.    As a direct and proximate result of ACC's failure to pay plaintiff's wages, she has suffered lost earnings and benefits.

81.    Because ACC's refusal to pay Ms. McEntee her wages is not the result of a *bona fide* dispute, ACC is liable to Ms. McEntee in the amount of three times (3x)  the amount of unpaid compensation, plus the attorneys' fees and costs incurred in bringing this claim.

## COUNT III:
## DISCRIMINATION AND RETALIATION IN VIOLATION OF
## ARTICLE I, CHAPTER 27 OF THE MONTGOMERY COUNTY CODE.

82.    Plaintiff hereby incorporates by reference as though restated each of the factual allegations contained in paragraphs 1 through 81 above.

83.    Maryland Code, Article 49B, § 42 authorizes a civil action for damages or other relief by "a person who is subjected to an act of discrimination prohibited by the county code."

84.    The Montgomery County Code, § 27-19 , prohibits discrimination based on sex.

85.    Defendant ACC deliberately discriminated against Ms. McEntee on the basis of sex by, *inter alia,* undermining her authority as CEO, reducing her responsibilities, attempting to circumvent or alter her Employment Agreement, treating her less favorably than similarly-situated male employees, and ultimately terminating her employment.

21

86.    The Montgomery County Code, § 27-19, also prohibits an employer from retaliating against an employee for engaging in protected activity under the Code.

87.    Plaintiff engaged in protected activity under the Code by opposing the discriminatory and sexist treatment of ACC employees by the former CFO and taking legitimate steps to address that behavior by terminating his employment.

88.    Defendant ACC was aware of plaintiff's protected activity.

89.    Defendant retaliated against plaintiff for engaging in this protected activity by, *inter alia*, undermining her authority as CEO, reducing her responsibilities, attempting to circumvent or alter her Employment Agreement, treating her less favorably than similarly-situated male employees, and ultimately terminating her employment.

90.    The actions of defendant ACC described above constitute discrimination and retaliation in violation of the Montgomery County Code.

91.    The actions of defendant ACC described above were willful, malicious, and reckless, and were taken in knowing or reckless disregard of plaintiff's rights.

92.    The actions of defendant ACC described above directly and proximately caused, and continue to cause, plaintiff McEntee emotional distress, pain and suffering, anguish, humiliation, indignity, personal embarrassment, and damage to her professional reputation.

## **Requested Relief**

WHEREFORE, plaintiff prays this Court for the following relief:

1.    Enter a judgment in plaintiff's favor and against ACC for breach of contract based on ACC's diminution of plaintiff's duties as CEO and failure to pay her the compensation detailed in paragraph 6 of the Employment Agreement, plus interest;

2.    Enter a judgment in plaintiff's favor and against defendant ACC under the Maryland Wage Payment and Collection Act, Md. Code Ann. Lab. & Empl. § 3-501 et seq., based on ACC's failure to pay plaintiff McEntee wages owed under paragraph 6 of the Employment Agreement, the amount trebled, plus interest, costs and attorneys' fees;

3.    Enter a judgment in plaintiff's favor and against defendant ACC under Maryland Code, Article 49B, § 42 and the Montgomery County Code § 27-19, based on ACC's sex discrimination and retaliation against plaintiff, in an amount to be determined at trial;

4.    An award to plaintiff of compensatory damages in an amount to be proven at trial, but in any even not less than $2,000,000;

5.    An award to plaintiff of punitive damages in an amount to be proven at trial, but in any event not less than $6,000,000;

6.    An award of reasonable attorneys' fees and costs; and

7.    All other relief the court deems just.

_____
Debra S. Katz        D.C. Bar #411861
Lisa J. Banks        D. C. Bar #470948

KATZ, MARSHALL & BANKS, LLP
1718 Connecticut Ave., N.W.
Sixth Floor
Washington, D.C. 20009
Phone: (202) 299-1140
Fax: (202) 299-1148

Attorneys for Plaintiff Christine W. McEntee

DATED: October 19, 2006

24

# EMPLOYMENT AGREEMENT

THIS AGREEMENT, made this 22 day of July 2003, between the American College of Cardiology, a non-profit corporation whose principal office is at 9111 Old Georgetown Road, Bethesda, MD 20814-1699 (hereinafter referred to as "ACC"), and Christine W. McEntee (hereinafter referred to as "Employee ").

WHEREAS, ACC is a professional society of cardiovascular physicians and scientists; and

WHEREAS, the Employee has the professional and personal skills to serve ACC and can be instrumental in helping it to achieve its objectives to the mutual benefit of both parties; and

WHEREAS, the parties wish to establish an employment relationship and to provide for certain contingencies recognizing the value to ACC of the efforts and activity of the Employee;

NOW, THEREFORE, in consideration of the mutual promises and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by ACC and the Employee.

IT IS AGREED:

1.    Term of Employment and Compensation. Effective January 1, 2003, Employee hereby binds herself to serve ACC throughout the period covered by this paragraph in the capacity of Chief Executive Officer, and shall exert her energy and time to the prosecution of her duties, and shall promptly and faithfully perform all these duties which pertain to that employment. ACC agrees to retain the services of the Employee in the position of Chief Executive Officer for a term of three (3) years with the effective commencement date of January 1, 2003, at a salary of $350,000 per annum, payable in equal semimonthly installments.

Employee's performance and salary shall be reviewed each year during the last quarter of

1-NV/15286.3

McEntee v. ACC/ACCF
Civil Complaint
Exhibit 1

the year. Any pay adjustment and bonus awards shall be at the discretion of the ACC Board of Trustees acting through its Executive Committee and shall be consistent with the compensation philosophy and plan approved by the Executive Committee in July 2001. Any pay adjustment will become effective January 1 of the year following. Bonus payments shall be approved by ACC's Executive Committee at its Spring meeting.

2.    Extension.  Annually during this Agreement, on or before December 31 of each year, the term of this Agreement shall automatically be extended for an additional one (1) year period under the terms and conditions set forth in this Agreement unless the Agreement shall have terminated for one of the reasons set forth in Section 6 below.

3.    Duties.  During the term of employment, Employee shall perform the duties of the Chief Executive Officer in accordance with ACC's bylaws, rules, regulations, policies and procedures and shall provide competent executive management services for ACC. Employee shall also be Chief Executive Officer of the American College of Cardiology Foundation ("ACCF") and shall provide competent executive management services for ACCF.    The Employee shall perform such other executive services and executive duties for ACC and ACCF as may be entrusted to Employee in accordance with the bylaws of ACC and ACCF and consistent with the terms of this Agreement. Throughout the term of this Agreement, Employee shall be the Chief Executive Officer of ACC and ACCF, and she shall report to and be responsible to the Boards of Trustees of ACC and ACCF. In addition, Employee shall:

(a)    Have full, broad and exclusive authority to manage ACC and ACCF operations, to hire, compensate and terminate ACC and ACCF staff and consultants within the framework of the approved budget of ACC and ACCF, and to establish and modify the duties and responsibilities of said staff and consultants; and

(b)     In consultation with the Executive Committee, have full, broad, and exclusive authority to retain outside legal counsel, public relations counsel and other consultants for ACC and ACCF; and

(c)     Have the right to have prior notice of and to be present at all meetings of the Board of Trustees and Executive Committee; and

(d)     Be provided by ACC with a private office, secretarial assistance, and such technical and other support as is consistent with Employee's position and adequate for the performance of the Employee's duties under this Agreement.

4.     Expense Reimbursement. ACC acknowledges that the successful operation and management of its business will require the Employee to expend in the discharge of her duties substantial sums of money for travel, meals, and other business costs incident to her role as Chief Executive Officer. The Employee shall be reimbursed for such reasonable costs by ACC upon presentation of statements in a manner required by ACC policies and in accordance with the budget approved by ACC.

5.     Additional Benefits.

(a)     Travel. Employee shall be expected to travel as required by her position. In all such cases, ACC shall pay or reimburse Employee for all ordinary and necessary expenses incurred for Employee's attendance at such meetings. For especially long and arduous flights, Employee may use her discretion in choosing the class of service. For any overseas travel, Employee shall be eligible for business class type service, if available.

(b)     Professional Association Dues and Expenses. ACC shall pay or reimburse Employee for appropriate professional association dues and fees as may be incurred. In addition, the Employee shall be reimbursed for all ordinary and necessary expenses incurred by Employee

in attending or otherwise participating in the programs of such organizations, within the budget approved by ACC.

      (c)      Retirement Benefits.  ACC shall provide the Employee with annual retirement income at the rate of 60% of base salary commencing on the Employee's 65th birthday and continuing through age 86 (the "Pension Benefit"). The Pension Benefit shall be offset by the following:

      (1) Social Security income

      (2) Distributions from the 403(b) program sponsored by ACC,

      (3) Distributions from the ACC 457(b) eligible deferred compensation plan, and

      (4) Drawing down personal savings derived from the "Accumulated Excess Payments", described below.

ACC shall make an annual contribution equal to twelve and one-half percent (12.5%) of Employee's base salary to the 403(b) program sponsored by ACC, up to applicable legal limits. Over the legal limits, ACC will pay Employee as added compensation for use by Employee as retirement income, twelve and one-half percent (12.5%) of the difference between the legal limit and Employee's base salary, plus Federal and state income tax and other payroll taxes owed on the added compensation, which compensation shall increase as a function of Employee's salary (the "Excess Payment"). Accumulated Excess Payments are the cumulative of the annual Excess Payments received by the Employee through age 65 compounded at an assumed annual rate of return of 5.2%.

ACC shall make annual contributions on behalf of Employee to a 457(b) eligible deferred compensation plan sponsored by ACC. The amount contributed shall be equal to the maximum amount permitted by law.

(d)    Life Insurance.    Employee shall be provided with a term life insurance policy with a death benefit amount at least three times Employee's annual salary.

(e)    Other.    The Employee shall be entitled to the standard benefits provided to other ACC employees as provided in ACC's Personnel Policy Manual.    The Employee shall be entitled to elect at ACC's expense an annual executive physical examination to the extent such examination is not covered by any existing plan or benefit afforded by ACC.    In addition, ACC shall allocate $25,000 (Twenty-Five Thousand Dollars) annually to defray the cost of additional benefits which the Chief Executive Officer may, in her sole discretion, determine are commensurate with her position of Chief Executive Officer.

6.    Termination and Dismissal.    ACC reserves the right to terminate its obligations under Paragraph 1 of this Agreement in the event of the death of the Employee or if, due to physical or mental illness or injury ("disability") Employee is unable to perform the essential functions of her position with or without reasonable accommodation, for a continuous period of six (6) months.    During the period of disability, Employee shall continue to receive her full salary and benefits, or the equivalent thereof if Employee becomes eligible for short term disability and/or long term disability benefits.    Additionally, ACC may terminate Employee's employment in the event of such acts of fraud or gross negligence ("reasonable cause") as would prevent the effective performance of Employee's duties.

At any time while this Agreement is in effect, if ACC wishes to terminate this Agreement for any other reason ("no cause"), it may do so, but it must provide Employee with four and one-half (4.5) months' prior notice of such termination (or the equivalent pay in lieu of notice). Upon giving Employee four and one-half (4.5) months notice, ACC shall buyout the remaining term of this Agreement by (i) paying to Employee an amount equal to one year's salary, payable

in installments as it had paid salary under this Agreement, (ii) paying as a lump sum, a good faith estimate of the bonus which she would have otherwise received for services performed in the year of termination, (iii) paying as a lump sum, all unpaid bonuses, if any, attributable to prior years, and (iv) continuation for the 12-month period following date of termination all benefits to which she would have been entitled if she had remained employed.

If at any time the Employee wishes to terminate her obligations under this Agreement, she shall give ACC at least four and one-half (4.5) months' advance written notice.

7.    Restrictive Covenant. So long as this Agreement remains in effect, the Employee shall not take part in, consult with or provide services to any enterprise, association or society that is in any way in a competitive business with ACC without its consent. In addition, for the same period, the Employee shall not take part in, consult with or provide services to any enterprise, association or society where such participation conflicts with the activities or business purposes of ACC. Nothing in this section shall prevent Employee from engaging in outside activities not related or a part of her duties and responsibilities as Chief Executive Officer of ACC even if such outside activities generate income to Employee, so long as such outside activities do not interfere or compromise Employee's performance as Chief Executive Officer.

8.    Successors. This Agreement shall be binding upon the parties hereto, their heirs, executors, administrators, successors and assigns. Neither the Employee nor her spouse, however, shall assign any part of his or her rights under this Agreement unless ACC agrees thereto in writing. In the event of a merger, consolidation, or reorganization involving ACC, this Agreement shall continue in force and become an obligation of ACC's successor or assigns.

9.    Waiver. Either party's waiver of, or failure to exercise, any right provided for in this Agreement shall not be deemed a waiver of any further or future right under this Agreement.

1-NV/15286.3                                6

10.    Governing Law. This Agreement shall be governed by the laws of the State of Maryland.

11.    Entire Agreement. This instrument contains the entire agreement of the parties. It may not be changed orally, but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification, extension, or discharge is sought.

_Nancy J. Nawles_
Witness   7/28/03

**EMPLOYEE**

_Christine W. McEntee_
Christine W. McEntee
7/28/03

_Linda H. Horne_
Witness
LINDA H. HORNE
July 24, 2003

Linda H. Horne
MY COMMISSION # DD140724 EXPIRES
September 30, 2006
BONDED THRU TROY FAIN INSURANCE INC.

**AMERICAN COLLEGE OF CARDIOLOGY**

_Carl J. Pepine_
By:  CARL   J.  PEPINE

1-NV/15286.3

7

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CHRISTINE W. MCENTEE,                     )
3606 Roberts Lane                          )
Arlington, VA 22207                        )
                          Plaintiff,       )
                                           )
v.                                         )
                                           )
AMERICAN COLLEGE OF CARDIOLOGY, INC.       )
2400 N Street, N.W.                        )
Washington, D.C. 20037                     )
                                           )
          SERVE:                           )
          CSC Lawyers Incorporating Service Co.  )
          11 E. Chase Street               )
          Baltimore, MD 21202              )
                                           )
and                                        )
                                           )          C.A. No. _____
AMERICAN COLLEGE OF CARDIOLOGY             )
FOUNDATION                                 )          JURY DEMAND
2400 N Street, N.W.                        )
Washington, D.C. 20037                     )
                                           )
          SERVE:                           )
          Jack Lewin, M.D.                 )
          ACCF                             )
          2400 N Street, N.W.              )
          Washington, D.C. 20037           )
                                           )
                                           )
                                           )
                          Defendants.      )
                                           )
                                           )

JURY DEMAND

Plaintiff Christine W. McEntee demands a jury trial on all claims so triable.

Debra S. Katz          D.C. Bar #411861
Lisa J. Banks          D. C. Bar #470948

KATZ, MARSHALL & BANKS, LLP
1718 Connecticut Ave., N.W.
Sixth Floor
Washington, D.C. 20009
Phone: (202) 299-1140
Fax: (202) 299-1148

Attorneys for Plaintiff Christine W. McEntee

DATED: October 19, 2006

1:06 1813
H JR

**CIVIL COVER SHEET**

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| CHRISTINE W. MCENTEE 3606 Roberts Lane Arlington, VA 22207 | AMERICAN COLLEGE OF CARDIOLOGY FOUNDATION and AMERICAN COLLEGE OF CARDIOLOGY, INC. 2400 N Street, N.W. Washington, D.C. 20037 |

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF 88888
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT    11001
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Katz, Marshall & Banks, LLP
1718 Connecticut Avenue, N.W.
Sixth Floor
Washington, D.C. 20009

CASE NUMBER  1:06CV01813

JUDGE: James Robertson

DECK TYPE: Employment Discrimination

DATE STAMP: 10/20/2006

JURY ACTION

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ● 2 U.S. Government Defendant
- ○ 3 Federal Question (U.S. Government Not a Party)
- ● 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ● 4 |
| Citizen of Another State | ● 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**○ A. Antitrust**

- ☐ 410 Antitrust

**○ B. Personal Injury/ Malpractice**

- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 368 Asbestos Product Liability

**○ C. Administrative Agency Review**

- ☐ 151 Medicare Act

Social Security:
- ☐ 861 HIA ((1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g)
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g)

Other Statutes
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**○ E. General Civil (Other)**   OR   **○ F. Pro Se General Civil**

Real Property
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

Personal Property
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

Bankruptcy
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

Property Rights
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

Federal Tax Suits
- ☐ 870 Taxes (US plaintiff or defendant)
- ☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
- ☐ 610 Agriculture
- ☐ 620 Other Food &Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

Other Statutes
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation

- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ G. *Habeas Corpus/ 2255* | ⊚ H. *Employment Discrimination* | ○ I. *FOIA/PRIVACY ACT* | ○ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☒ 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans<br>(excluding veterans) |

| ○ K. *Labor/ERISA (non-employment)* | ○ L. *Other Civil Rights (non-employment)* | ○ M. *Contract* | ○ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☒ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

⊚ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Breach of contract; Maryland Wage Payment and Collection Act; Montgomery County Human Relations Act based on termination/failure to pay severance

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $ $8,000,000    Check YES only if demanded in complaint<br>JURY DEMAND:   YES ☒   NO ☐ |
|---|---|---|

| **VIII. RELATED CASE(S) IF ANY** | (See instruction)   YES ☐   NO ☒ If yes, please complete related case form. |
|---|---|

DATE   Oct. 19, 2006 ✓    SIGNATURE OF ATTORNEY OF RECORD    *[signature]*

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The **JS-44** civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.